IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AS 6500 CHILLUM PLACE NW, WASHINGTON, DC 20012 | Misc No. 17-<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Allison Landsman, a Special Agent with the Environmental Protection Agency, Criminal Investigation Division, having been duly sworn, depose and state the following:

## AFFIANT'S EXPERIENCE

1. I am a Special Agent (SA) with the Environmental Protection Agency Criminal Investigation Division (EPA-CID), Washington Resident Office in Washington, District of Columbia. I have been employed with EPA-CID since 2013. I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia. On January 31, 2014, I completed the Occupational Safety and Health Administration's (OSHA) Hazardous Waste Operations and Emergency Response (HAZWOPER) training program. This training taught me how to identify the existence of hazardous materials and eliminate hazardous exposure risks. Prior to being a federal law enforcement officer with EPA-CID, I supported civil inspections and enforcement for the Environmental Protection Agency for approximately five years as a Program Analyst. I have Bachelor's and Master's degrees in Environmental Science and Environmental Management from the University of Maryland.

2. As a Special Agent with EPA-CID, I am authorized to conduct investigations of suspected criminal violations of federal laws, including violations of the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2689 et seq. As a federal law enforcement officer, I am also authorized to apply for and execute search warrants under 18 U.S.C. § 3063.

3. This matter is being investigated in conjunction with the Environmental Crimes Unit of the Metropolitan Police Department (MPD), the District of Columbia's Office of Inspector General (DC OIG), and the Federal Bureau of Investigation (FBI).

## INTRODUCTION

4. This affidavit is submitted in support of an application for a search warrant for the premises known as 6500 Chillum Place NW, Washington, District of Columbia (hereinafter at times referred to as "the Premises"), as further described in Attachment A, for the evidence and instrumentalities described in Attachment B, including any and all records, electronically-stored information, documents, and photographs reflecting that the occupants of the Premises violated TSCA. Attachment C describes the duration and special conditions for the warrant sought.

5. I have personally participated in, and have witnessed many of the facts and circumstances underlying the investigation of the offenses alleged in this affidavit. The statements contained in this affidavit are based on reliable information provided to me by other law enforcement agents and regulatory personnel, as well as official documents and reports I have reviewed in furtherance of the investigation. This affidavit is being submitted for the limited purpose of securing a search warrant. I have not included each and every fact known concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause for the issuance of the requested search warrant.

6. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that the location described in Attachment A hereto contains evidence of various crimes, and instrumentalities and fruits of such crimes, including violations of TSCA, 15 U.S.C. §§ 2689 and 2615(b).

## LEGAL BASIS FOR THE SEARCH

7. Lead is a poison to the human body. Though completely preventable, lead poisoning continues to be a major environmental health problem in the United States. Lead exposure, while potentially harmful to individuals of any age, is particularly dangerous to children under the age of six. It can cause a variety of negative health effects, including learning problems, lowered intelligence, hyperactivity, and even death. Pregnant women are at particular risk from lead, which can cause miscarriage, reduced fetal growth, and premature birth. Lead-based paint in older homes and buildings is among the most common sources of childhood lead poisoning.

8. The federal Residential Lead Hazard Reduction Act (LHRA) ensures that lead-based paint (LBP) and LBP hazards are taken into account in the sale, rental, and renovation of homes and apartments. The term "lead-based paint" means paint or other surface coatings that contain lead in excess of limits established under section 302(c) of the Lead-Based Paint Poisoning Prevention Act, a statute requiring the Secretary of the U.S. Department of Housing and Urban Development (HUD) to "establish procedures to eliminate as far as practicable the hazards of lead-based paint poisoning with respect to any existing housing" covered by or receiving funds from a federal housing program. 42 U.S.C. §§ 4822(a)(1), 4841(3). The term "lead-based paint hazard" means any condition that causes exposure to lead from lead-contaminated dust, soil, or paint that is deteriorated or present in accessible surfaces, friction

surfaces, or impact surfaces that would result in adverse human health effects as established by the appropriate Federal agency. 42 U.S.C. § 4851(b)(15).

9. The regulations described below generally apply to "target housing," which means any housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in such housing) or any 0-bedroom dwelling. 42 U.S.C. § 4851(b)(27); 40 C.F.R. § 745.103.

***Lead-Based Paint Renovation, Repair, and Painting Rule***

10. In 2008, EPA promulgated the Lead-Based Paint Renovation, Repair, and Painting Rule (the RRP Rule). The RRP Rule requires that firms performing renovation, repair, or painting projects that could disturb LBP in homes built before 1978 have their firm certified by EPA, use certified renovators trained by EPA-approved training providers, provide owners and occupants with pre-renovation education, and follow lead-safe work practices.

11. 40 C.F.R. § 745.82 specifies that the RRP Rule applies to all renovations performed for compensation in target housing, except where:

a. A certified inspector or risk assessor makes a written determination that affected components are lead-free and the renovation firm obtains a copy of that determination; or

b. A certified renovator properly using an EPA-recognized test kit or a laboratory recognized by EPA determines that each component affected by the renovation is lead-free.

12. "Renovation" means modification of any existing structure or portion thereof, that results in the disturbance of painted surfaces, unless part of an abatement. 40 C.F.R. § 745.83. According to the definition:

> The term renovation includes (but is not limited to): The removal, modification or repair of painted surfaces or painted components (e.g., modification of painted doors, surface restoration, window repair, surface preparation activity (such as sanding, scraping, or other such activities that may generate paint dust)); the removal of building components (e.g., walls, ceilings, plumbing, windows); weatherization projects (e.g., cutting holes in painted surfaces to install blown-in insulation or to gain access to attics, planning thresholds to install weather-stripping), and interim controls that disturb painted surfaces. A renovation performed for the purpose of converting a building, or part of a building, into target housing or a child-occupied facility is a renovation under this subpart. The term renovation does not include minor repair and maintenance activities.

*Id.*

13. As relevant here, "minor repair and maintenance activities" include "minor heating, ventilation or air conditioning work, electrical work, and plumbing, that disrupt 6 square feet or less of painted surface per room for interior activities or 20 square feet or less of painted surface for exteriors . . . where the work does not involve window replacement or demolition of painted surface areas." *Id.*

14. "Renovator" means an individual who either performs or directs workers who perform renovations. *Id.*

15. "Abatement" means any set of measures designed to permanently eliminate LBP hazards, including: (1) removal of LBP and lead-contaminated dust, permanent enclosure or encapsulation of LBP, replacement of lead-painted surfaces/fixtures, removal or permanent covering of soil; and (2) related preparation, cleanup, disposal, and clearance testing. 15 U.S.C. § 2681(1); 40 C.F.R. § 745.223.

16. Abatement is a specialized activity designed to address LBP in the home, while renovation activities covered by the RRP Rule may *incidentally* disturb LBP. Abatement work is subject to different regulations, but the present investigation does not directly concern abatement.

17. The RRP Rule requires that specific lead-safe work practices be followed when conducting renovation subject to the rule. These practices are set forth in 40 C.F.R. § 745.85 and include: posting warning signs; containing the work area to prevent the release of dust or debris; containing waste during and after renovation activities; cleaning the work area after the renovation is complete until no dust, debris, or residue remains; and performing a post-renovation cleaning verification to ensure that no dust, debris, or residue is still present on surfaces in and below the work area, including windowsills and the ground.

18. Firms performing work subject to the RRP Rule must retain all records necessary to demonstrate compliance with the rule for a period of three years following completion of the renovation. 40 C.F.R. § 745.86(a). Specifically, firms must retain records that a certified renovator was assigned to the project, that the certified renovator provided on-the-job training for workers used on the project, that the certified renovator performed or directed workers who performed all of the tasks required by the lead-safe work practice standards, and that the certified renovator performed the required post-renovation cleaning verification.

***Lead-Based Paint Disclosure Rules***

19. In 1996, pursuant to their statutory mandates, EPA and HUD jointly promulgated the Real Estate Notification and Disclosure Rule, 40 C.F.R. § 745.107, which requires sellers or lessors of pre-1978 housing not subject to a narrow set of exemptions, listed in 40 C.F.R.§ 745.101 and inapplicable here, to provide a potential buyer or tenant and agent with certain information pertaining to the presence of LBP and related hazards.

20. In general, under 40 C.F.R. § 745.107, before the purchaser of target housing "is obligated under any contract to purchase or lease target housing," a seller or lessor must:

a. Provide the prospective purchaser or lessee with an EPA-approved lead hazard information pamphlet;

b. Disclose to the purchaser or lessee the presence of any known LBP and/or LBP hazards in the housing being sold, along with any additional information about these conditions;

c. Provide the purchaser or lessee with any records or reports available pertaining to LBP and/or LBP hazards; and

d. Disclose to each real estate or leasing agent the presence of any known LBP or LBP hazards, the existence of any available records or reports pertaining to LBP and/or LBP hazards, and any additional information available about these conditions.

21. 40 C.F.R. § 745.113 requires that each contract to sell or lease pre-1978 housing include an attachment containing the following elements:

a. A specified lead warning statement;

b. A statement by the seller or lessor disclosing the presence of known LBP and/or LBP hazards, or indicating no knowledge thereof, and any additional information available about these matters;

c. A list of any records or reports that the seller has provided to the purchaser or lessee about LBP and/or LBP hazards;

d. A statement by the purchaser or lessee affirming receipt of the required information and lead hazard pamphlet;

e. A statement by the agent that he or she has informed the seller or lessor of its obligations under the law and that the agent is aware of his or her own duty to ensure compliance;

f. Dated signatures of the seller or lessor, agents, and purchaser/lessee certifying to the accuracy of their respective statements; and

g. The purchaser or lessee's statement that he or she has received or waived the opportunity for an inspection or risk assessment.

22. Sellers, lessors, and agents must retain a copy of the completed attachment for each transaction for a period of three years. 40 C.F.R. § 745.113(c).

23. 42 U.S.C. § 4852d(b)(5) makes violations of the disclosure requirements in either 40 C.F.R. § 745.107 or 40 C.F.R. § 745.113 a "prohibited act" under Section 2689 of TSCA, 15 U.S.C. § 2689.

***Criminal Penalties***

24. Under 15 U.S.C. § 2689, it is unlawful for any person to fail or refuse to comply with the TSCA provisions or associated regulations described above.

25. Any person who knowingly or willfully violates any provision of § 2689 is subject to a criminal fine of not more than $50,000 for each day of violation, or to imprisonment for not more than one year, or both. 15 U.S.C. § 2615(b).

## FACTUAL BASIS FOR PROBABLE CAUSE

26. Based on my investigation, some of which is outlined below, I have learned that District Properties (also known as District Properties.com Inc., DC Business License # 410516000409) is a company which purchases residential properties, renovates and then sells them for up to $2,775,000. Its principal place of business is at 6500 Chillum Place NW,

Washington, DC 20012. According to LinkedIn.com, Mohammad Sikder ("SIKDER") has been District Properties' CEO since October 2002. According to the website of the DC Department of Regulatory and Consumer Affairs (DCRA), SIKDER is the governor of District Properties.com Inc., and the registered address is at 6500 Chillum Place NW. The company's registration is "active." The DCRA Office of General Counsel stated that DCRA has taken enforcement actions against District Properties on at least ten occasions and that the company has a history of permit violations and citizen complaints.

27. DCRA records show that another company named District Properties Limited LLC was also registered in 2012 at the 6500 Chillum Place address. An individual named Jafar Hashim was listed as the governor of this entity. The company's registration has since been revoked.

28. District Properties is closely intertwined with another company, Relux Homes ("Relux"), of which SIKDER is also the CEO according to LinkedIn.com. During an interview with an EPA Region 3 Civil Enforcement inspector on October 15, 2015, District Properties' Senior Project Manager Sushil Jha ("JHA") stated that the company uses the name Relux Homes for properties built and renovated in Virginia and uses the District Properties name for properties built and renovated in Washington, DC. (This may not be a consistent practice, as a DCRA inspector observed and photographed a Relux Homes sign in front of a DC property on November 21, 2014.) According to JHA, the managers and employees for District Properties and Relux Homes are the same.

29. District Properties avails itself of "special purpose entities," which are subsidiary or alter ego companies created for a limited purpose, such as to shield the company from civil liability. These entities include Rupsha 2007 LLC, Rupsha 2011 LLC, and Rupsha 2013 Inc. The

company has submitted numerous building permit applications under the "District Properties" name for properties recorded as owned by "Rupsha" subsidiaries. Information submitted to DCRA states that the principal place of business for Rupsha 2007 LLC, Rupsha 2011 LLC, and Rupsha 2013 Inc., is at the 6500 Chillum Place NW address. Another related company, Rupsha 2012 Inc., lists its principal place of business as 6660 Tennyson Drive, McLean, VA 22101. This address is listed as a property owned by Relux on Relux's website. SIKDER is listed as governor for all of these "Rupsha" entities. In my experience, the use of such corporate sub-entities is a common practice among real estate developers in the area.

30. 52nd St Development Inc. is another apparent subsidiary of District Properties. This entity purchased a property at 3801 52nd Street NW, Washington DC, which was subsequently renovated. District Properties is listed as agent for 52nd St Development Inc., and the registered address for the entity is at 6500 Chillum Place NW. SIKDER identified himself as representative for the property's owner on a building permit application for the 3801 52nd Street NW property. On two building permit applications for the property, the same phone number is listed for both District Properties and 52nd Street Development Inc.

31. Because District Properties.com Inc., Relux, 52nd St Development Inc., and the "Rupsha" entities are overlapping, I will use the name District Properties to refer to any and all business entities managed by SIKDER from the 6500 Chillum Place NW address. On the company's Website (www.district-properties.com), the company identifies itself as "District Properties," based at the Chillum Place address. Moreover, on building permit applications, the company typically identified itself as "District Properties," even when the corporate owner of the property was a sub-entity like Rupsha 2013.

32. On all communications to EPA, DOEE, and DCRA that I have reviewed, District Properties has stated that its principal place of business is at 6500 Chillum Place NW, Washington DC. These communications included permit applications, emails, and reports. The most recent communication stating this address as the place of business was an email to DOEE from SIKDER on December 19, 2016. EPA Region 3 Civil Enforcement conducted an inspection of District Properties at the 6500 Chillum Place address in October 2015 with SIKDER and other District Property employees present.

33. I have personally conducted surveillance on the site. The Premises had a “District Properties” sign on the front of the building. On February 23, 2017, I observed a black Range Rover vehicle and several other vehicles parked in front of this address. These vehicles are registered to District Properties.com Inc., according to the DC Motor Vehicle records.

34. Based on records that I have reviewed, District Properties has hired Elite Technical LLC to conduct LBP inspections and complete other activities related to LBP at properties being renovated in DC. Elite Technical LLC is a contractor that performs lead abatement, inspections, demolition, and risk assessments. The company is a DC-certified lead abatement company with a company license number of DC14-4361. It has its principal place of business at 4220 9th Street SE, #23B, Washington DC, 20032. The company’s CEO is Chijioke Onuoha. In an interview with an EPA Region 3 Civil Enforcement inspector on November 12, 2015, Onuoha claimed that his company had no other employees.

35. I have checked EPA’s database of renovators that are certified to conduct renovation work on a property subject to the RRP Rule, and none of the companies named above are certified to perform this work.

36. I respectfully submit that there is probable cause to believe that District Properties violated 15 U.S.C. §§ 2689 and 2615(b), by (1) performing renovation work on target (pre-1978) housing without using a certified renovator, following recordkeeping requirements, or following lead-safe work practices; and (2) failing to disclose information and reports in District Properties' possession to prospective buyers, relating to LBP and LBP hazards at pre-1978 residential properties it renovated and re-sold. This affidavit will discuss District Properties' general practices with regard to pre-1978 properties before describing the facts concerning two specific properties.

***District Properties' Pre-1978 Properties***

37. Since 2011, District Properties has purchased and renovated at least 24 properties in Washington DC that were constructed prior to 1978, according to the DC Office of Tax and Revenue Real Property Tax Database, which is publically available on DCRA's website. According to a DCRA representative I spoke to, this database is the authoritative source of information about the age of a DC property. The addresses of the 24 relevant properties are listed in a table in Attachment B. A summary of the information found in this section can be found in a chart at the end of the section.

38. Based on my experience and knowledge concerning the real estate industry, I am aware that sellers of residential properties typically "list" their home on a Multiple Listing Service ("MLS"), a cooperative of agents and brokers who share listings in a market area. The Metropolitan Regional Information Systems ("MRIS") is a large MLS serving the DC area. According to the MRIS website, it supports over 45,000 real estate professionals. Real estate listings typically provide certain basic information to a potential purchaser, including, for residential properties, the "Year Built." The listing is a common source of information for

potential purchasers. I spoke to several licensed DC-area real estate agents as part of this investigation; each agent stated (in summary) that the Real Property Tax Database is the authoritative source for a building's date of construction, and that the "Year Built" in the MLS listing is also used informally. The agents did not know of any other reliable source where the date of construction may be obtained.

39. I reviewed the publically-available MRIS listings for 22 of the 24 pre-1978 residential properties purchased by District Properties since 2011 (two listings were not available). These are the listings that were available at the time District Properties bought the properties. At least 13 of these properties were purchased since January 1, 2013. Each and every listing accurately stated that the residence was constructed prior to 1978.

40. After purchasing the properties, District Properties submitted building permit applications to DCRA for each of these 24 pre-1978 properties, to conduct renovation work with the intention to resell. I reviewed the applications associated with 20 of the properties. (I have requested but not yet received the other applications from DCRA.) The applications required the person submitting it to certify that the application was "complete and correct to the best of my knowledge." Building permit applications for 19 of the 20 properties falsely stated that the property was built after 1978. (One of the earliest applications I reviewed, from 2011, did not ask whether the property was pre-1978, so there was no statement in this regard.) For one of these 19 properties (the "Aberfoyle Property," discussed below), District Properties completed four separate applications. In the first application, District Properties correctly stated that the building was pre-1978, but in the next three applications, the company falsely stated otherwise. SIKDER was listed as the engineer on each application I reviewed. All of the applications I reviewed also indicated that District Properties intended to conduct renovation work on a scale that would very

likely require District Properties to comply with the RRP Rule. That is, the scope of the work called for substantial renovation activity that, in my experience, would almost always involve the disturbance of more than 6 square feet of interior painted surfaces per room or 20 square feet of the exterior painted surfaces. The building permits issued by the city specifically stated that "[w]henever any such work related to this Permit could result in the disturbance of lead based paint, the permit holder shall abide by" the RRP Rule. By falsely stating that the properties were built after 1978, and thereby not alerting DCRA to the potential presence of LBP at those properties, the company could more easily evade compliance with federal and local laws.

41. I also reviewed information on MRIS for the 24 pre-1978 properties renovated and listed for sale by District Properties since 2011. At least 22 of the listings posted by District Properties at the time of resale contain language indicating that significant renovation work on a scale that would likely be subject to the RRP Rule occurred. Examples of this kind of language include: "Another fabulous top to bottom renovation by District Properties building your dream home" (Source: 1216 Kennedy Street NW); "Stunning 4500+ sq ft, total renovation" (Source: 1315 Delafield Place NW); "Barnaby Woods Gem renovated from top to bottom will sweep u off ur feet" (Source: 3284 Aberfoyle Place NW); "Majestic Tudor on a corner lot. Top to bottom renovated and expanded home" (Source: 4323 Garfield Street NW).

42. Each of the 24 listings I reviewed for the pre-1978 properties sold by District Properties since 2011 included accurate information for the "Year Built," that is, a year that matches what is recorded in the DC Real Property Tax Database.

43. In sum, District Properties completed renovation work on at least 24 pre-1978 homes in DC, including at least 13 since 2013. District Properties falsely claimed a post-1978 construction date on building permit applications for every property reviewed to date (19 total)

about which the company was asked about the date of construction. The company made these false statements even though both the DC Real Property Tax Database and the MRIS listing from the time of purchase showed that the properties were pre-1978.

44. The evidence gathered so far indicates that District Properties knew the correct date of construction for its properties. First, District Properties is an experienced renovator that has worked on dozens of properties. Second, District Properties listed 24 pre-1978 properties for sale with the correct date of construction, including all of the properties the company falsely claimed were post-1978 in building permit applications. Moreover, I have obtained federal lead-paint disclosure forms signed by District Properties for 12 of the pre-1978 properties the company sold since 2011. Ten of the 12 forms accurately state that the relevant properties were pre-1978, including three on which the exact date of construction is handwritten (not all of the forms required the exact date). On one of the forms District Properties failed to make any disclosure as to the age of the property, and on another form the company inaccurately claimed that a property was post-1978. SIKDER's signature appears to be on all of the disclosure forms I have reviewed.

45. The legal significance of the properties' pre-1978 status and District Properties' knowledge of this status is specifically explained below with regard to two pre-1978 properties at which LBP was found to be present.

## Summary Chart: District Properties' Known Pre-1978 Properties Since 2011

[46]

| **Address** | **Year Built** (Source: DC Office of Tax and Revenue) | **Date Purchased (Close Date) by District Properties** (Source: MRIS) | **Year Built on Listing when Purchased by District Properties** (Source: MRIS) | **Listed as Post-1978 on Building Permit Application?** (Source: DCRA) | **Disclosed as Pre-1978 by District Properties** (Source: Sales Contract Disclosure Document) | **Property Owner According to Deed** (Source: DC Office of Tax and Revenue-Recorder of Deeds) |
|---|---|---|---|---|---|---|
| 1003 Evarts Street NE, Washington DC | 1918 | 6/22/2012 | 1918 | Yes | Unknown | RUPSHA 2012 Inc |
| 1216 Kennedy Street NW, Washington DC | 1923 | 9/27/2012 | 1923 | Yes | Yes | RUPSHA 2013 Inc |
| 1315 Delafield Place NW, Washington DC | 1912 | 7/25/2013 | 1912 | Unknown | Unknown | RUPSHA 2013 Inc |
| 1441 Kearney Street NE, Washington DC | 1905 | Unknown | Unknown | Unknown | Unknown | RUPSHA 2007 LLC |
| 1443 G Street NE, Washington DC | 1912 | 3/1/2013 | 1912 | Yes | Yes | RUPSHA 2013 Inc |
| 1508 D Street NE, Washington DC | 1928 | 12/21/2012 | 1928 | Yes | Yes | RUPSHA 2013 Inc |
| 1618 Newton Street NE, Washington DC | 1923 | 8/26/2011 | 1923 | The question was not asked in the permit application. | Unknown | RUPSHA 2007 LLC |
| 228 15th Street NE, Washington, DC 20002 | 1925 | 3/12/2013 | 1925 | Yes | Unknown | RUPSHA 2013 Inc |
| 2718 Hamlin Street NE, Washington DC | 1921 | 3/13/2013 | 1921 | Yes | No | RUPSHA 2013 |
| 3284 Aberfoyle Place NW, Washington DC | 1949 | 4/26/2012 | 1949 | First application stated that building/ structure was built before 1978, but in subsequent building permit applications submitted for the same property, District Properties stated that the building/ structure was built after 1978. | Yes | RUPSHA 2012 Inc |
| 3520 South Dakota Avenue | 1926 | 1/28/2013 | 1926 | Yes | Unknown | RUPSHA 2013 Inc |

| | | | | | | |
|---|---|---|---|---|---|---|
| NE, Washington DC | | | | | | |
| 3800 52nd Street NW, Washington DC | 1958 | 10/2/2014 | 1958 | Yes | Unknown | RUPSHA 2013 Inc |
| 3801 52nd Street NW, Washington DC | 1957 | 10/2/2014 | 1957 | Yes | Unknown | 52nd St Development Inc |
| 3912 5th Street NW, Washington DC | 1912 | 5/4/2012 | 1912 | Yes | Unknown | RUPSHA 2012 Inc |
| 4323 Garfield Street NW, Washington DC | 1929 | 5/30/2014 | 1929 | Yes | Yes | RUPSHA 2013 Inc |
| 4327 8th Street NW, Washington DC | 1907 | 12/24/2012 | 1907 | Yes | Unknown | RUPSHA 2013 Inc |
| 4404 15th Street NW, Washington DC | 1917 | 11/7/2012 | 1917 | Unknown | Yes | RUPSHA 2013 Inc |
| 4807 Davenport Street NW, Washington DC | 1924 | Unknown | Unknown | Yes | Yes | RUPSHA 2013 Inc |
| 5231 Connecticut Ave NW, Washington DC | 1924 | 5/28/2012 | 1924 | Unknown | Unknown | RUPSHA 2012 Inc |
| 5243 Sherier Place NW, Washington DC | 1942 | 1/26/2015 | 1942 | Yes | Unknown | RUPSHA 2007 LLC |
| 5329 Illinois Ave NW, Washington DC | 1910 | 4/29/2013 | 1910 | Yes | Yes | RUPSHA 2013 Inc |
| 5525 30th Street NW, Washington DC | 1936 | 1/24/2013 | 1936 | Yes | Yes | RUPSHA 2013 Inc |
| 5536 30th Place NW, Washington DC | 1935 | 3/29/2013 | 1935 | Yes | Unknown | RUPSHA 2012 Inc |
| 6625 Harlan Place NW, Washington DC | 1925 | 6/9/2014 | 1925 | Yes | Yes | RUPSHA 2013 Inc |

***Garfield Property***

47. The purchase money construction deed of trust for 4323 Garfield Street NW (hereinafter "Garfield Property") bears what appears to be District Properties CEO SIKDER's signature and was recorded on June 18, 2014, with the District of Columbia's Recorder of Deeds. District Properties purchased the property using a subsidiary entity, Rupsha 2013 Inc. The deed

of trust states that the property plat and associated easements/right of ways were recorded in the Office of Surveyor for the District of Columbia in 1929. The Real Property Tax Database states the home was constructed in 1929. The MRIS listings from when District Properties purchased the home and when the company offered the home for resale each state that the "Year Built" was 1929. This property went under contract for sale by District Properties on September 21, 2016. The sales contract includes an acknowledgement by SIKDER that the property was built before 1978.

48. On October 14, 2014, District Properties submitted a building permit application to DCRA for addition, alteration, and repair of the property. Under the section of the application titled "Lead Abatement," there was a question asking whether the property was built prior to 1978. The box "no" was checked. SIKDER was listed as the engineer for the work. In addition, the application includes a supplemental "Environmental Questionnaire," in which District Properties again represented that the home was built after 1978. SIKDER is listed as the affiant for this questionnaire. Tommy Wells, the director of DOEE, explained in a letter I reviewed that the company was later confronted with this inaccuracy regarding the date of construction and other allegations related to LBP at the property. According to Mr. Wells, District Properties claimed that checking the box stating that the property was built post-1978 was an "error" on the building permit application. However, as discussed above, District Properties made the same false statement with regard to at least 19 different pre-1978 properties since 2011.

49. On November 21, 2014, DCRA Inspector Robert Cluff ("Inspector Cluff") visited the property in response to a citizen complaint. In a written report with photographs that I reviewed, Mr. Cluff wrote that "structural interior demolition occurred before my arrival." The photographs show that the building had undergone significant demolition activities. Numerous

windows were removed, as well as exterior painted surfaces that appear to be larger than 20 square feet, and interior painted surfaces that appear to be larger than 6 square feet. Inspector Cluff issued a Notice of Infraction and Stop Work Order to Rupsha 2013 Inc. for exceeding the scope of its building permit and failing to post signage required by the city.

50. In June 2015, DCRA and DOEE received additional citizen complaints expressing concern about renovation at the property and potential dangers associated with LBP.

51. In response to the citizen complaints about the property, between June 2, 2015, and October 7, 2015, DOEE Inspector Shawn Wright ("Inspector Wright") visited the property on four different occasions. His notes are recorded in a "Complaint Inspection Memorandum" which I have reviewed. DOEE did not issue any violations as a result of these visits. At an inspection conducted on September 22, 2015, Inspector Wright met on-site with District Properties' Senior Project Manager JHA.

52. On July 8, 2015, District Properties hired Elite Technical to perform a LBP inspection at the Garfield Property. I have reviewed a copy of the initial report resulting from this inspection. (As discussed below, the report was later amended.) The initial report stated that "Lead-based paints were not found on the tested paint surfaces analyzed," and that "lead-paint hazards do not exist in the property." However, this testing occurred only after the building interior was already gutted. Moreover, the actual test results attached to the report did show the presence of LBP on the exterior based on levels established by EPA. Further, the samples were not collected from "each painted component affected by the renovation," as would be required to exempt further renovation work from the RRP Rule under 40 C.F.R. § 745.82.[1] (The renovation

[1] Under 40 C.F.R. § 745.83: "Component or building component means specific design or structural elements or fixtures of a building or residential dwelling that are distinguished from each other by form, function, and location. These include, but are not limited to, interior

work already conducted could not have been exempt because no testing had occurred yet.) Only 10 samples were taken from the entire property, including samples of only three brick wall sides. No samples were taken of the ceilings. According to a report I have reviewed of an interview of Elite Technical CEO Onuoha by EPA Region 3 Civil Enforcement Inspector Paul Ruge ("Inspector Ruge") on November 12, 2015, Onuoha acknowledged that he only tested the exterior of the property. District Properties possessed a copy of Elite's initial report and provided it to Inspector Ruge on October 15, 2015.

53. On August 19, 2015, Inspector Ruge received a citizen complaint regarding the Garfield Property from a neighbor. The complainant alleged that District Properties was illegally renovating the property and raised concerns about neighbors, workers, and potential future homeowners being exposed to LBP.

54. Acting on the complainant's tip, Inspector Ruge visited the Garfield Property on August 28, 2015. He saw two or three workers engaged in activity on the exterior structure of the property, and he observed and photographed a District Properties truck on-site. Inspector Ruge's observations from the inspection were memorialized in an Inspection Report dated August 23, 2016, which I have reviewed. According to this report, "Inspector Ruge observed that windows, window frames, doors, door frames, and painted siding were removed from the residence."

---

components such as: Ceilings, crown molding, walls, chair rails, doors, door trim, floors, fireplaces, radiators and other heating units, shelves, shelf supports, stair treads, stair risers, stair stringers, newel posts, railing caps, balustrades, windows and trim (including sashes, window heads, jambs, sills or stools and troughs), built in cabinets, columns, beams, bathroom vanities, counter tops, and air conditioners; and exterior components such as: Painted roofing, chimneys, flashing, gutters and downspouts, ceilings, soffits, fascias, rake boards, cornerboards, bulkheads, doors and door trim, fences, floors, joists, lattice work, railings and railing caps, siding, handrails, stair risers and treads, stair stringers, columns, balustrades, windowsills or stools and troughs, casings, sashes and wells, and air conditioners."

Under the RRP Rule, the fact that windows were removed meant that the work could not qualify as a "minor repair [or] maintenance activit[y]." 40 C.F.R. § 745.83. In addition, Inspector Ruge observed that, "[d]emolition debris was on the ground on all sides of the residence."

55. Because the property was built before 1978 and testing was inadequate to demonstrate that no LBP was present, any renovation work on the Garfield Property was required to comply with the RRP Rule and should have been carried out by an EPA-certified renovator. 40 C.F.R. § 745.82. I checked EPA's publically-available database and confirmed that District Properties is not and has never been an EPA-certified renovator. In addition, Elite Technical is not and has never been an EPA-certified renovator.

56. Because the renovation was subject to the RRP Rule, the renovator was required to follow applicable lead-safe work practices, as described above. *See* 40 C.F.R. § 745.85. The citizen who complained to EPA about the property claimed, in written submissions that I have reviewed, to have observed several violations of these practices, including failure to contain dust and debris, resulting in the release of these materials onto adjacent properties. The complainant used a home test kit to test for LBP, and the dust and debris tested positive for LBP. Inspector Ruge confirmed during his October 15, 2015 office inspection that violations of the lead-safe work practices had occurred, including the failure to post any warning barriers or signs relating to LBP and the failure to contain dust or debris. During this visit and based on the age of the property, Inspector Ruge identified the likely presence of LBP that was peeling from the remaining window frame woodwork, the siding where it was torn away, and from the soffits on the east side of the house.

57. On October 15, 2015, Inspector Ruge visited District Properties' offices at 6500 Chillum Place NW. He met with SIKDER, who told him to direct his questions to Senior Project

Manager JHA and General Manager Omar Seck ("SECK"), who were in another room. SIKDER was not present for the subsequent interview of JHA and SECK. During this interview, JHA stated that he was familiar with the work being conducted on the Garfield Property. He stated that he was familiar with the requirements to safely renovate a home containing LBP and acknowledged that his company was not an EPA-certified firm for this type of work. When Inspector Ruge asked JHA about the age of the property, JHA stated that the year the property was built was on the building permit. Inspector Ruge reviewed the building permit and found that it did not contain the year the home was constructed. As noted above, in applying for the permit, District Properties had falsely indicated that the property was constructed after 1978.

58. JHA claimed that Elite Technical performed the demolition of affected lead paint areas at the property. Elite Technical CEO Onuoha acknowledged to Inspector Ruge that he completed demolition of more than 500 square feet of both interior and exterior walls at the Garfield Property. District Properties signed a contract with Elite Technical, which I have reviewed, to "[d]emolish completely interior of property including drywall" and to "demolish [the] roof system." District Properties directed the scope of this work. Neither District Properties nor Elite Technical was certified by EPA to perform renovation work at the property, as required by the RRP Rule. Moreover, District Properties was the entity that completed the building permit application for the renovation of the property, listing SIKDER as the engineer. Senior Project Manager JHA was on-site during Inspector Wright's September 22, 2015, inspection. And a District Properties truck was on-site when Inspector Ruge saw workers there on August 28, 2015. The report from Elite Technical's inspection on July 8, 2015, stated that at the time of that inspection, District Properties was "in the process of renovating the home," that such renovation was "on-going," that the interior had already been "gutted and boarded up," and that "[t]he

property has been partially demolished," with most of the exterior intact, corroborating Inspector Ruge's subsequent observations on August 28, 2015. To the extent District Properties employees directed or supervised any renovation work, the company was a "renovator" subject to the requirements of the RRP Rule. *See* 40 C.F.R. § 745.83 ("*Renovator* means an individual who either performs or directs workers who perform renovations."). Because District Properties knew the Garfield Property was pre-1978, the renovation work it carried out without required EPA certification was a criminal violation of TSCA under 15 U.S.C. § 2689.

59. Moreover, as the renovator of a pre-1978 property, District Properties was required to keep records that a certified renovator was assigned to the project, that the certified renovator provided on-the-job training for workers used on the project, that the certified renovator performed or directed workers who performed all of the tasks required by the lead-safe work practice standards, and that the certified renovator personally performed the required post-renovation cleaning verification. See 40 C.F.R. § 745.86(b)(6). When Inspector Ruge asked whether District Properties had any of these records related to LBP for the Garfield Property, JHA responded that the company did not. The failure to keep required records was a criminal violation of TSCA under 15 U.S.C. § 2689.

60. The Garfield Property was listed for sale on June 8, 2016 for $2,987,000. After the listing, District Properties hired a different DC-certified environmental risk assessor, Green Environmental, to complete a new LBP inspection of the Garfield Property on August 23, 2016. A report based on the inspection is dated August 31, 2016. I reviewed the report. The report stated that LBP dust levels were within permissible federal limits, and that the property "has passed" the inspection. The report does not show an absence of LBP – only that LBP dust was within acceptable limits. Unlike the previous inspection performed by Elite Technical on July 8,

2015, this new inspection contained samples mostly from the inside of the residence. There were only two exterior samples taken, from the "floor" of the front and rear exterior. Moreover, the inspection occurred only after the building was gutted, the main renovation work was completed, and the home was listed for sale.

61. On August 31, 2016, one of the citizen complainants e-mailed District Properties' real estate agent, and carbon copied SIKDER, to notify the agent that an EPA civil investigation regarding the property was underway. The complainant stated: "Please ensure that you make the appropriate disclosure . . ." SIKDER replied to the e-mail: "We just got the report of not having a single lead based paint in this house. The house is totally free of lead based paint. The report was made by DC authorized inspector. We will send you the report and you can disclose it to prospective buyer. Thanks." The statements in this e-mail inaccurately characterized Green Environmental's report. The report does not show an absence of lead based paint – only that LBP dust on the areas sampled was within permissible limits.

62. On September 2, 2016, Elite Technical CEO Onuoha produced an amended report based on his inspection of the Garfield Property on July 8, 2015. Onuoha had been contacted in late August by DOEE regarding the discrepancy in his initial report between his claim that no LBP was present at the property and the attached test results showing the presence of LBP. According to DOEE, Onuoha acknowledged that he made a mistake. His revised report, which I reviewed, expressly states that LBP was found at several places on the property, including the side porch fascia, brick walls, and exterior door and window trims. The report states that "lead-paint hazards do exist in the property," that "[a]ll lead-based paint components will have to be made intact, or remediated in order to be safe," and that "the positive components have to be remediated, before renovation activities can continue on this property." Finally, the report

expressly states: "Federal law requires that this property's owner provide a copy of this lead-paint inspection report . . . to future tenants or purchasers of this property before they become obligated under a lease or sales contract." According to a DOEE timeline I was provided, this revised report was e-mailed by a DOEE representative to District Properties and its real estate agent on September 2, 2016, almost three weeks before the home went under contract for sale.

63. The property went under contract on September 21, 2016, and one of the prospective buyers is pregnant. The sale has not closed according to MRIS.

64. Once LBP has been identified at a property, the seller must "disclose any additional information available concerning the known lead-based paint" to the buyer, including "the basis for the determination that lead-based paint . . . exist[s]." 40 C.F.R. § 745.107(a)(2). The seller must also "provide the purchaser or lessee with any records or reports available to the seller or lessor pertaining to" LBP at the target housing. *Id.* (emphasis added). On November 18, 2016, DOEE sent a letter to District Properties requesting "any DC lead disclosure forms provided for" several properties, including the Garfield Property. In response, District Properties provided the federally-required LBP disclosure form. On the form, District Properties checked two boxes stating, "Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing," and "Seller has provided Buyer with all available records and reports pertaining to lead-based paint and/or lead paint hazards in the housing," after which District Properties handwrote: "Inspection rport [sic] showing absence of lead in the house." There is no indication that District Properties updated the form to reflect the revised Elite Technical inspection report that DOEE emailed to District Properties on September 2, 2016, showing that Elite Technical had found LBP on the exterior of the home.

65. On March 16, 2017, I obtained a copy of all nine documents attached to the MRIS listing for the sale of the Garfield Property by District Properties. The listing purports to contain the property's lead disclosures. The federal disclosure form described in the previous paragraph is attached. In addition, a document titled "Lead Based Paint Disclosure" contains an inspection report dated October 14, 2015, from DOEE, which cites the initial Elite Technical report stating that "no lead-based paint hazards were identified at the Property." The Green Environmental lead inspection report dated August 31, 2016, is also attached. According to the MRIS Website, which I have viewed, the report was uploaded on September 4, 2016. However, neither the initial Elite Technical inspection report containing test results showing the presence of LBP, nor the revised Elite Technical report from September 2, 2016, expressly stating the LBP hazards were present at the time of inspection, was attached to the listing. The listing is consistent with SIKDER's email to the company's real estate agent, described above, instructing that the agent should disclose the Green Environmental Report as evidence of lack of LBP.

66. Under 40 C.F.R. § 745.107(a)(4), District Properties was required to disclose "any records or reports available to the seller or lessor pertaining to lead-based paint and/or lead-based paint hazards in the target housing being sold or leased." Based on the information provided above, I believe there is probable cause that District Properties knowingly violated this regulation, and therefore TSCA, by failing to provide Elite Technical's inspection reports to the person(s) who are obligated under a sales contract to purchase the home.

***Aberfoyle Property***

67. The DC Real Property Tax Database states that the property at 3284 Aberfoyle Place, NW, Washington, DC 20015 (hereinafter, "Aberfoyle Property") was built in 1949. District Properties purchased the home on April 26, 2012 for $500,000, under the name Rupsha

2012 Inc. The MRIS listings for the home when purchased and when District Properties resold it on February 28, 2013 for $805,000 each correctly state that the "Year Built" was 1949.

68. On April 17, 2012, District Properties submitted a building permit application to DCRA for alteration and repair of the property. The scope of work is stated as "Renovation of SFD [Single Family Dwelling]." Under the section of the application titled "Lead Abatement," the question asking whether the property was built prior to 1978 is answered "yes." However, the application claimed that more than 2 square feet of lead paint would not be removed. It is unclear how District Properties would have made this determination, as the property appears to have not yet been tested for LBP. (Or if it had, District Properties failed to provide this inspection as part of its seller's disclosures, which would be also be a violation of federal law, see below.) SIKDER is listed as the engineer for the work, and District Properties is listed as the contractor. On July 13, 2013, District Properties submitted a second building permit application to DCRA containing a revision to the previously granted permit. This time, the box "no" was checked for the question about whether the property was built prior to 1978. The company subsequently submitted two more applications in which the "no" box was checked.

69. On April 30, 2012, DCRA received a citizen complaint associated with the Aberfoyle Property from a neighbor on the street. The complainant alleged that District Properties was performing demolition activities without taking precautions for the disturbance of LBP.

70. DOEE Lead Inspector Shawn Wright and DCRA Inspector Robert Cluff jointly visited the Aberfoyle Property on April 30, 2012. According to Inspector Cluff's notes, which I have reviewed, no one was present at the property at the time of inspection. Inspector Cluff's notes state that "demolition activities have taken place" on the interior of the property. No

permits were posted for the work as required under DC law. As a result of the inspection, Inspector Cluff issued a Stop Work Order for the property for conducting demolition work without a permit. According to the inspector's notes and photographs, the Stop Work Order was physically posted on the front door of the property. In addition, Inspector Wright issued a Notice of Violation and Order to Eliminate Lead-Based Paint Hazard(s) ("Notice of Violation"). The Notice of Violation, which I have reviewed, indicates that LBP hazards were identified on the exterior concrete window sills and on the right and left side concrete foundation wall. It required the property owner to abate all of the LBP hazards at the property that were identified during the DOEE inspection. Both the Stop Work Order and the Notice of Violation were issued to the name of the previous owner of the property before District Properties, even though District Properties was the owner at the time. A representative from DCRA that I spoke to explained that the new ownership had not yet been recorded with the city. District Properties' subsequent actions, including the submission of a new building permit application and hiring of Elite Technical to perform abatement work, demonstrate that it received both the Stop Work Order and Notice of Violation.

71. District Properties hired Elite Technical to conduct an LBP inspection of the property on May 11, 2012. Senior Project Manager JHA provided EPA Region 3 Civil Enforcement Inspector Ruge with a copy of the report during Inspector Ruge's visit to the company's office on Chillum Place NW on October 15, 2015. The report states that, "Lead-based paint hazards were found in this property," including "deteriorating lead-based paints with evidence of chipping and peeling paint conditions found in the property on the date of visit." The hazards affected numerous building components including the front door, dining room, back porch, and various parts of the basement. The report advised: "Deteriorated paint conditions in

the property identified as lead-based paint should be corrected, and made intact before any renovation activities can continue." The report expressly states that District Properties would be responsible for disclosing the report to future purchasers.

72. On May 25, 2012, Elite Technical obtained a DC Lead Abatement Permit from DOEE for the Aberfoyle Property. (Though not an EPA-certified renovator, Elite Technical was certified to perform abatement work, which, as discussed above, is different.) In the permit application to DOEE, Elite Technical stated that the property was built in 1949.

73. District Properties hired H&D Environmental to conduct an exterior lead visual clearance inspection on June 5, 2012. The inspection did not include the interior of the property. H&D Environmental produced a report to District Properties stating that all lead abatement work was successfully completed on the areas inspected. However, the inspector wrote that he only visually examined the "Front Porch and Grounds," the front entrance, and the "Rear yard and rear area where wooden back-porch was removed." The inspector did not examine the dining room or basement areas where LBP hazards had previously been identified. The report does note that the "interior components in this residence have been gutted." During his October 15, 2015, visit to District Properties' office, EPA Inspector Ruge spoke to JHA and SECK about the Aberfoyle Property. JHA confirmed that Elite Technical completed the LBP inspection of the property and claimed that Elite Technical conducted demolition of all the areas that contained LBP. City inspectors who visited the property on April 30, 2012, however, saw that some interior demolition had already occurred, more than a week before Elite Technical performed its initial inspection. JHA stated that renovation work on the property included the replacement of around a dozen windows totaling approximately 200 sq. ft., painting approximately 1200 sq. ft. inside the residence, and painting 700 sq. ft. outside the residence. Work of that scale is subject

to the RRP Rule. JHA stated the only employee for District Properties that was on the job was the project manager who was in charge of oversight. However, JHA also stated he did not have any contracts related to this work, which would include contracts with subcontractors. JHA did not know if any of the workers on the job were RRP-certified and did not have any training records available.

74. District Properties submitted the building permit application for the renovation work, listed its CEO as the engineer, listed itself as the contractor for the work, and assigned a project manager to oversee the work, indicating that District Properties was a "renovator" under the RRP Rule. Because the property was built before 1978, any renovation work on the Aberfoyle Property was required to comply with the RRP Rule, *see* 40 C.F.R. § 745.82, and should have been carried out by an EPA-certified renovator. Because District Properties knew the Aberfoyle Property was pre-1978, the renovation work it carried out without required EPA certification was a criminal violation of TSCA under 15 U.S.C. § 2689.

75. The MRIS listing for the sale of the Aberfoyle Property by District Properties states that the home was "renovated from top to bottom." On November 30, 2016, I met with the current homeowner of the Aberfoyle Property who bought for property for $805,000 on February 28, 2013. The homeowner recalled being told by District Properties' real estate agent that the house was "taken down to the studs," almost completely renovated, and did not have any LBP. After the home was purchased, the homeowner became aware of citizen complaints regarding LBP reported when the property was being renovated. The homeowner stated that she did not see the property when it was being renovated but subsequently learned of the Stop Work Order issued to District Properties. The homeowner did not recall ever being provided documents

pertaining to LBP at the property that District Properties possessed, such as the inspection reports or the Notice of Violation discussing LBP hazards.

76. The homeowner provided me with the sales contract from the purchase of the home, which included the federally-required lead disclosure document, signed with a signature appearing to be that of SIKDER on January 13, 2013. In this document, District Properties checked the box reading "Seller/Landlord has no knowledge of lead-based paint and/or lead-based paint hazards in the housing. District Properties also stated that "Seller/Landlord has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing." Based on the facts described above, the second statement was false because District Properties possessed several such records. District Properties failed to disclose the DOEE Notice of Violation for LBP hazards, Elite Technical's inspection report showing the presence of LBP hazards, and the H&D Environment LBP post-abatement clearance report, in contravention of its obligation under 40 C.F.R. § 745.107(a)(4) to disclose "any records or reports available to the seller or lessor pertaining to lead-based paint and/or lead-based paint hazards in the target housing being sold or leased." SIKDER's name and what appears to be his signature are printed at the bottom of the form, certifying to the accuracy of the statements therein.

***Summary of Probable Cause***

77. Based on my review of public records, District Properties has purchased and sold at least 24 pre-1978 properties since 2011, including 13 since 2013. The company listed its three most recent pre-1978 properties for sale on April 20, 2016, May 30, 2016, and June 8, 2016. For all of the pre-1978 properties the company has purchased or sold since 2011, the correct date of construction was available on the Real Property Tax Database, and was stated accurately in the MRIS listing under "Year Built," at both the time of purchase and re-sale. On at least 9 occasions

since 2011, District Properties provided purchasers with federal lead-paint disclosure forms, which appear to be signed by CEO SIKDER, that acknowledged the property was pre-1978. Nonetheless, on building permit applications for 19 of the 24 known pre-1978 properties that District Properties renovated since 2011, and on which SIKDER is listed as engineer, the company falsely claimed the properties were constructed after 1978.

78. At both the Garfield and Aberfoyle Properties, building permit applications for renovation work were completed by District Properties, listing SIKDER as the engineer. Renovation work conducted or directed by District Properties at these properties appeared to be in violation of the RRP Rule requirement for failing to hire an EPA-certified renovator to do the work at target housing. EPA Region 3 Civil Enforcement determined that federally-required lead-safe work practices were not followed at the Garfield Property. Records related to LBP at the Garfield Property appear not to have been maintained by District Properties for three years, as required under the RRP Rule. In federally-required LBP disclosures provided to purchasers, District Properties failed to disclose all information pertaining to LBP at both the Garfield and Aberfoyle Properties, as required by the RRP Rule.

79. Given the patterns and practices described above, there is also probable cause to believe similar conduct, including unlawful renovation work and failure to make proper disclosures of LBP information to purchasers, occurred at one or more of the other 22 pre-1978 homes District Properties has bought and resold since 2011. The company has a consistent practice of purchasing pre-1978 homes, submitting false building permit applications, and performing major renovation work to which the RRP Rule likely applied, and for which the company was not certified. Moreover, I have obtained federal LBP disclosure forms signed by District Properties for a total of 12 pre-1978 properties. For nine of the ten other properties,

besides the Garfield and Aberfoyle Properties, for which I have obtained these forms, the company has denied knowledge to the buyer of any reports or records related to LBP at the property. For the tenth property, the company did not provide any answer about whether such records exist.

## LOCATION AND EXISTENCE OF RECORDS

80. I am seeking this warrant to corroborate the statements of witnesses, to find further evidence concerning who conducted renovation work at all pre-1978 properties renovated by District Properties, Relux Homes, 52nd St Development Inc., or any corporate entity containing the word "Rupsha," including Rupsha 2013, Inc., Rupsha 2011 LLC, Rupsha 2007 LLC, or Rupsha 2012 Inc., and the extent of that work, to determine if there are other instances of document falsification, and to obtain evidence concerning how, when, and with whose knowledge this conduct occurred. Therefore, as described in greater detail in Attachment B, I am seeking authority to search for and seize originals of project-related documents and personnel records for individuals who allegedly performed renovation work. I am seeking authority to search for and seize documents relating to District Properties' recordkeeping practices, including documents relating to compliance with work practice standards, and EPA documentation requirements. I am seeking authority to search for and seize documents and correspondence relating to District Properties' ownership, employees, and individuals who assisted in acquiring and selling the properties renovated, including real estate agents and settlement companies. Finally, I am seeking authority to search for and seize documents relating to customer concerns or complaints about lead exposure, compliance with applicable legal requirements, and/or District Properties' handling of LBP paint chips, dust, or debris.

81. I submit that there is probable cause to believe that the evidence described above, which is more fully described in Attachment B, exists at District Properties' office in Washington, District of Columbia (described in Attachment A) for the following reasons:

a. 6500 Chillum Place NW, Washington DC, is the primary and, to my knowledge, sole office maintained by District Properties;

b. Based upon my knowledge, training, and experience, it is usual and customary for a business such as District Properties to keep and maintain records relating to business operations, employee training, standard operating procedures, clients and customers, as well as other business records;

c. The RRP Rule requires that District Properties retain records related to renovation work it carried out at pre-1978 properties for three years and, if requested, to make available to EPA all records necessary to demonstrate compliance with lead-safe work practice standards and documentation requirements;

d. The documents handed to inspectors by, and sent electronically from, District Properties agents, employees and officers list the Premises as the mailing address;

e. While visiting the Premises in October 2015, Inspector Ruge observed a computer used by SIKDER and hard copies of documents and files in and around the office that included business records and technical files such as engineering plans. Inspector Ruge observed at least two other employees at the Premises, and other computers presumably used by employees;

f. Inspector Ruge observed documents at the Premises that reference LBP and LBP hazards at properties purchased by District Properties, as well as engineering plans,

permits, permit applications, email communications, and letters concerning the company's properties;

g. In response to a request from DOEE in November 2016, District Properties produced to DOEE, by email, LBP disclosure documents for several properties, all of which were constructed prior to 1978; and

h. Based on information I obtained from DCRA and the DC Office of Tax and Revenue, I am aware of 24 instances in which District Properties obtained building permits from DCRA for pre-1978 properties.

i. In February 2017, I conducted surveillance on the Chillum Place address and observed vehicles registered to District Properties.

82. During Inspector Ruge's visit to District Properties in Washington, DC, he was not able to determine the manner in which the items identified in Attachment B are maintained. Specifically, he did not know whether project files and other documents pertaining to the RRP Rule are segregated from non-RRP documents. If, during the search, it is apparent that RRP-related project files and other documents identified in Attachment B are segregated or maintained separately, I intend to seize only those segregated or separated documents.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

83. As described above and in Attachment B, this application seeks permission to search for records that might be found on the Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices. As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers,

notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

84. *Probable Cause*. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices are found on the Premises, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

a. When EPA Inspector Ruge visited District Properties in October 2015, District Properties employees provided him with certain business documents that they printed using a computer;

b. SIKDER has communicated electronically with DOEE via email and provided DOEE with electronic versions of Excel spreadsheets and Adobe PDF documents containing information on properties renovated from 2012 to the present;

c. District Properties has electronically submitted building permit applications to DCRA;

d. SIKDER has electronically signed federally-required lead disclosure documents in sales contracts for real estate transactions.

e. During his October 15, 2015 visit to the Chillum Place address, Inspector Ruge observed SIKDER using a laptop computer.

f. In my training and experience, in the event that individuals change computers, they will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

g. Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery"

file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

85. *Forensic Evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices at the Premises because:

a. Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained

on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This “user attribution” evidence is analogous to the search for “indicia of occupancy” while executing a

search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and

associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f. I know that when an individual uses a digital device to transmit false information, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I understand that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

86. *Methods To Be Used To Search Digital Devices.* Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of

software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the Premises. Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain enormous amounts of data.

d. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the

owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools, a controlled laboratory environment, and can require substantial time.

e. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are

recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f. Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile

devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

g. Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices. In light of these difficulties, this affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

87. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a. Upon securing the Premises, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing

the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review if analysis cannot be complete at the Premises. For all the reasons described above, it may not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the Premises. The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

b. The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c. In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or

digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

88. District Properties is a functioning company that conducts legitimate business. The seizure of District Properties' computers may limit District Properties' ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what electronic storage media and digital devices must be seized or copied, and what electronic storage media and digital devices need not be seized or copied. Where appropriate, law enforcement personnel executing the warrant will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of District Properties so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing functioning of District Properties' legitimate business. If, after inspecting seized computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve evidence, the government will return it.

## PRIVILEGE AND SCOPE FILTER PROTOCOL

89. Items to be seized are not intended, nor anticipated, to include information protected by the attorney-client privilege or the attorney work product doctrine. The search itself

and subsequent review, however, may involve exposure to, or the inadvertent review of, items which are protected by such privilege or doctrine. As is customary law enforcement practice, any materials encountered by the investigative or prosecution team members that appear to be privileged or otherwise protected, will be immediately segregated and marked as Potential Attorney-Client Materials. The purpose of this segregation is to limit exposure to investigative and prosecution team members and allow for a proper review to be conducted by a team not associated with the investigative or prosecution teams ("filter team").

90. With respect to the seizure of electronically-stored information (ESI), prior to substantive review by the investigative or prosecution teams, ESI will be electronically filtered using search terms to proactively identify potentially protected materials. Such materials will be segregated and reviewed in the same manner as hardcopy materials, by a filter team.

91. Finally, it is possible that materials could be inadvertently seized that are later determined to fall outside the scope of the warrant. In this event, if the materials are physical, hard copy, or the sole copy of a document or record, they will be returned to the owner, while if the materials are a duplicate of an electronic record obtained, for example, through the use of computer imaging, such duplicate will be erased or otherwise destroyed.

**REQUEST FOR SEALING**

92. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this Application, including the Application and Search Warrant. I believe that sealing this document is necessary because the items to be seized are relevant to an ongoing criminal investigation, and the existence and nature of this investigation is not believed to be known to the targets of the investigation. Premature disclosure

of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

Based on the information described above, I submit that there is probable cause to believe that District Properties has violated 15 U.S.C. §§ 2689 and 2615(b). I also submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the crimes, as described in Attachment B, are contained within the premises described in Attachment A.

Respectfully submitted,

________________________________
Allison Landsman, Special Agent
United States Environmental Protection Agency
Criminal Investigation Division
Washington Resident Office

SUBSCRIBED AND SWORN TO, this _____ day on April, 2017, at ________

________________________________
The Honorable Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### The Premises to be Searched

The target Premises to be searched is the following:

The District Properties office is located at 6500 Chillum Place NW, Washington, District of Columbia. District Properties operates half of this two-story building. The other half of this building is a U.S. Postal Service distribution facility. The two parts of the building are separated by walls and are not interconnected. The physical address for the U.S. Postal Service distribution facility is distinct from District Properties. District Properties operates all floors and spaces at the 6500 Chillum Place NW address. The entrance to the premises and its geographic location are pictured here:






**ATTACHMENT B**
**Items to be Seized**

The items sought to be seized by this search warrant at the Premises listed in Attachment A include the following materials from January 1, 2011, to the present:

1. Documents and records relating to pre-1978 properties purchased by District Properties, Relux Homes, 52nd St Development Inc., and any corporate entity containing the word "Rupsha," including but not limited to Rupsha 2013, Inc., Rupsha 2011 LLC, Rupsha 2007 LLC, or Rupsha 2012 Inc., or any pre-1978 property for which these companies hired or engaged a contractor to renovate, including, but not limited to, originals of contracts, checks, photographs, architectural drawings, schematics, blueprints, sketches, change orders, documents and records making representations to customers, customer certification forms acknowledging receipt of the EPA-Renovate Right Pamphlet, lead test documentation forms, renovation recordkeeping checklists, non-certified worker training documents, hands-on skills assessments, LBP inspection reports, LBP clearance reports, and federal, state, and local lead disclosure documents and records.

2. Documents, records, personnel files, training records, timesheets, and invoices relating to individuals or companies that performed renovation activities for District Properties, LLC, Relux Homes, 52nd St Development Inc., or any corporate entity containing the word "Rupsha."

3. All documents, records, and communications related to the acquisition and sale of pre-1978 properties including but not limited to ownership records, deeds, offers, advertisements, sales contracts, bank documents, and financial documents.

4. Documents and records referring or relating to the Lead-Based Paint Renovation, Repair and Painting Rule (the RRP Rule), work practice standards, or EPA documentation requirements, including, but not limited to, documents referring or relating to the communication of RRP requirements to employees, copies of standard operating procedures related to RRP compliance, and training materials or directives used by District Properties, Relux Homes, 52nd St Development Inc., or any corporate entity containing the word "Rupsha," to promote compliance with the RRP Rule.

5. Documents and records discussing, referring, or relating to communications regarding lead-based paint, lead-based paint hazards, concerns or complaints about lead exposure, compliance with applicable legal requirements, and/or the handling of paint chips, dust, or debris.

6. Documents and records concerning or relating to communications with inspectors from the District of Columbia or the federal government, contractors, lead risk assessors, lead inspectors, third party auditors, real estate agents, and prospective buyers associated with renovation activities, lead-based paint, or lead-based paint hazards.

7. All communications and correspondence with or about agents and/or employees of the DC Department of Energy and the Environment (DOEE), the DC Department of Consumer and Regulatory Affairs (DCRA), the U.S. Department of Housing and Urban Development (HUD), the U.S. Occupational Safety and Health Administration (OSHA), and the U.S. Environmental Protection Agency (EPA), and any other regulatory authority discussing permits or the permitting process, renovation activities, lead-based paint, or lead-based paint hazards.

8. Documents and records concerning or relating to properties at any of the following addresses, which were constructed prior to 1978 according to DC records:

| Address | Year Built (Source: DC Office of Tax and Revenue) |
|---|---|
| **1003 Evarts Street NE, Washington DC** | 1918 |
| **1216 Kennedy Street NW, Washington DC** | 1923 |
| **1315 Delafield Place NW, Washington DC** | 1912 |
| **1441 Kearney Street NE, Washington DC** | 1905 |
| **1443 G Street NE, Washington DC** | 1912 |
| **1508 D Street NE, Washington DC** | 1928 |
| **1618 Newton Street NE, Washington DC** | 1923 |
| **228 15th Street NE, Washington, DC** | 1925 |
| **2718 Hamlin Street NE, Washington DC** | 1921 |
| **3284 Aberfoyle Place NW, Washington DC** | 1949 |
| **3520 South Dakota Avenue NE, Washington DC** | 1926 |
| **3800 52nd Street NW, Washington DC** | 1958 |
| **3801 52nd Street NW, Washington DC** | 1957 |
| **3912 5th Street NW, Washington DC** | 1912 |
| **4323 Garfield Street NW, Washington DC** | 1929 |
| **4327 8th Street NW, Washington DC** | 1907 |
| **4404 15th Street NW, Washington DC** | 1917 |
| **4807 Davenport Street NW, Washington DC** | 1924 |
| **5231 Connecticut Ave NW, Washington DC** | 1924 |
| **5243 Sherier Place NW, Washington DC** | 1942 |
| **5329 Illinois Ave NW, Washington DC** | 1910 |
| **5525 30th Street NW, Washington DC** | 1936 |
| **5536 30th Place NW, Washington DC** | 1935 |
| **6625 Harlan Place NW, Washington DC** | 1925 |

9. Deleted files relating to documents and records described in the preceding paragraphs of this attachment.

10. Photographs and images of all structures, buildings, offices, equipment, and other areas located at the District Properties facility.

11. In order to search for the items described above that may be maintained in electronic storage media, law enforcement personnel are hereby authorized to search, copy, image and seize the following items for off-site review:

a. Any computer equipment and storage device capable of being used to commit, or further or store evidence of alleged violations of 7 U.S.C. § 136*l*(b)(1)(A);

b. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, digital camera memory cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

h. Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software, and router configuration software.

**ATTACHMENT C**
**Duration and Special Conditions of Search**

I. This warrant hereby authorizes the Environmental Protection Agency (EPA), the Federal Bureau of Investigation (FBI) the Metropolitan Police Department (MPD), the District of Columbia's Office of Inspector General (DC OIG), and their agents, employees, and contractors to initiate any search and seizure at the Premises as early as 7:00 a.m. on any date permitted by the warrant and to work continuously until the search is complete.

II. This warrant hereby authorizes the EPA, FBI, MPD, DC OIG, and their agents, employees, and contractors to bring to the Premises and to utilize whatever equipment and tools are necessary to search for and seize documents and electronic records being stored at the Premises, including equipment necessary for the imaging of computer hard drives.

III. This warrant hereby authorizes the EPA, FBI, MPD, DC OIG, and their agents, employees, and contractors to take photographs, to use water, electrical power, and telephone service at the Premises, to set up necessary equipment, and to establish safety perimeters as they deem necessary to accomplish the document collection.

IV. This warrant hereby authorizes the EPA, FBI, MPD, DC OIG, and their agents, employees, and contractors to restrict access to the Premises, including by the owners, during the duration of the search.